UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NICOLE BURTON, | § | Cv. No. 1:12-CV-1144 |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| FREESCALE SEMICONDUCTOR, | § | |
| INC., MANPOWER, INC, | § | |
| MANPOWER OF TEXAS, L.P., and | § | |
| TRANSPERSONNEL, INC., | § | |
| | § | |
| Defendants. | § | |

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

On July 25, 2014, the Court heard oral argument on a Motion for

Summary Judgment filed by Defendants Manpower, Inc. and Manpower of Texas,

L.P., and Transpersonnel, Inc. (collectively, "Manpower") (Dkt. # 30) and a

Motion for Summary Judgment filed by Defendant Freescale Semiconductor, Inc.

("Freescale") (Dkt. # 32).  Kelli Ascher Simon, Esq., appeared on behalf of

Plaintiff Nicole Burton ("Plaintiff").  Shafeeqa Giarratani, Esq., appeared on behalf

Freescale, and Michael Phillips, Esq., appeared on behalf of Manpower.  After

careful consideration of the memoranda in support of and in opposition to the

Motions, and in light of the parties' arguments at the hearing, the Court, for the

reasons that follow, **GRANTS** both Motions for Summary Judgment.

1

BACKGROUND

The following facts are taken from Plaintiff's Complaint: Plaintiff was hired by Manpower, a staffing agency, in October 2008 to work as an Operator for Freescale's semiconductor fabrication facility in Austin, Texas. ("Compl.," Dkt. # 1 ¶¶ 6–7.) Plaintiff alleges that on March 1, 2011, as a result of a machine malfunction, she inhaled a chemical called ACT930 while working at Freescale.[1] (Id. ¶ 7.) More than a month later, on April 12, 2011, Plaintiff experienced "shooting pains all over her body while at work" and an ambulance was called. (Id.) Plaintiff received treatment and remained at work until the end of the shift that day. (Id.)

Plaintiff alleges she began to experience heart palpitations "several weeks" following the April 12 incident and, on May 9, 2011, and May 17, 2011, she asserts that she went to the emergency room for heart palpitations. (Id. ¶ 8.) On June 6, 2011, Plaintiff again experienced heart palpitations while at work. (Id.) On that date, Plaintiff alleges she notified Defendants of her symptoms and she initiated a workers' compensation claim. (Id.)

Approximately one month later, Plaintiff again sought medical attention at the hospital due to chest pain and heart palpitations. (Id. ¶ 9.) During

---

[1] Plaintiff admits she did not inform anyone of the March 1 incident until approximately three months later in June. (See Compl. ¶ 8.)

that same week, she spoke with a Freescale supervisor, Patricia Alvarez, about sitting down when she felt ill.  (Id.)

On July 20, 2011, Plaintiff obtained a note from her doctor indicating that she should be allowed to sit down at work when she felt ill.  (Id. ¶ 10.)  On July 25, 2011, Plaintiff spoke with a Manpower supervisor, Joe Garcia, requesting that she be permitted to use a chair.  (Id.)  Plaintiff asserts that Garcia became "very upset" at her request, and informed her that "no chairs were allowed in any of the clean rooms[2] at Freescale," and that he did not believe Plaintiff should be allowed to sit.  (Id.)  However, Plaintiff contends that many other Operators were permitted to sit at Freescale and none of her job duties required her to stand for the entire shift.  (Id. ¶ 11.)

Plaintiff asked Garcia if she could be transferred to another position where she could sit the entire shift; she asserts that her request was denied, and Garcia threatened to remove Plaintiff from her assignment at Freescale.  (Id.)  On July 26, 2011, Plaintiff's assignment with Freescale was terminated.  (Id. ¶ 12.)

On December 14, 2012, Plaintiff filed a Complaint, asserting claims against Defendants for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., as amended by the ADA Amendments Act of 2008 ("ADA"), the

---

[2] At Freescale, microchips are manufactured in a "clean room" environment to ensure the microchips are not contaminated with any debris, which causes them to be ineffective.  (Dkt. # 32 at 3 n.2.)

Texas Labor Code § 21.051, et seq., and the Texas Labor Code § 451.001.

Specifically, Plaintiff asserts that Defendants: (1) discriminated against her on the

basis of a disability in violation of the ADA and the Texas Commission on Human

Rights Act ("TCHRA") by refusing to accommodate her disability, by failing to

engage in an interactive process with her, and by discharging her; and (2) retaliated

against her in violation of Texas Labor Code § 451.001 by terminating her

employment after she filed a workers' compensation claim.  (Id. ¶¶ 13, 20.)

<u>STANDARD OF REVIEW</u>

Summary judgment is proper when the evidence shows "that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 251–52 (1986).  The main purpose of summary judgment is to dispose of

factually unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,

323–24 (1986).

The moving party bears the initial burden of demonstrating the

absence of any genuine issue of material fact.  <u>Id.</u> at 323.  If the moving party

meets this burden, the non-moving party must come forward with specific facts

that establish the existence of a genuine issue for trial.  <u>ACE Am. Ins. Co. v.

Freeport Welding & Fabricating, Inc.</u>, 699 F.3d 832, 839 (5th Cir. 2012).  In

deciding whether a fact issue exists, "the court must draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

DISCUSSION

I.      Disability Discrimination Claim

Plaintiff alleges she was discriminated against on the basis of her disability in violation of the ADA and the Texas Commission on Human Rights Act by refusing to accommodate her disability[3], by failing to engage in an

---

[3] In her Response to Defendants' Motions for Summary Judgment, Plaintiff concedes her failure to accommodate claim and "failure to engage in an interactive process" claims.  She argues that she can demonstrate she is a "disabled" person within the meaning of the ADA under the "regarded as disabled" prong because "disability discrimination is alleged, but reasonable accommodation for the disability is not an issue."  (Dkt. # 33 at 8.)  She goes on that she is bringing a claim under the "regarded as disabled" prong because she has alleged that Defendants discriminated against her by "ending her assignment and refusing to offer her another."  (Id. at 9.)  No further argument on a "failure to accommodate" or a "failure to engage in an interactive process" claim is proffered.  Therefore,

interactive process with her, and by discharging her.  (Comp. ¶ 13.)

Section 12112(a) of the ADA prohibits an employer from discriminating against "a qualified individual with a disability" with respect to the terms, conditions, and privileges of employment.  Rayha v. United Parcel Service, Inc., 940 F. Supp. 1066, 1068 (S.D. Tex. 1996).  A "qualified individual with a disability" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  St. John v. NCI Bldg. Sys., Inc., 537 F. Supp. 2d 848, 860–61 (S.D. Tex. 2008) (citing 42 U.S.C. § 12111(8)).  To establish a prima facie case of disability discrimination, a plaintiff must show (1) she is disabled within the meaning of the ADA; (2) she is qualified for the job; (3) she was subject to an adverse employment action; and (4) she was replaced by or treated less favorably than non-disabled employees.  Id. at 860–61 (citing Gowesky v. Singing River Hosp. Sys., 321 F.3d 503, 511 (5th Cir. 2003)).  "To survive summary judgment, the plaintiff

---

based upon these statements, the Court concludes Plaintiff has waived her "failure to accommodate" and "failure to engage in an interactive process" claims under the ADA.  See Matthews v. City of Hous. Fire Dept., 609 F. Supp. 2d 631, 648 (S.D. Tex. 2009) ("To maintain a failure to accommodate claim, the plaintiff must show that she actually had a disability, not merely that she was regarded as having one."); Cato v. First Fed. Community Bank, 668 F. Supp. 2d 933, 946 (E.D. Tex. 2009) (discussing how in order to have a claim for failure engage in an interactive process, plaintiff must first make a request for accommodation).  Her remaining claim is that she was wrongfully discriminated against on the basis of her disability when her assignment with Freescale was terminated.

must produce substantial evidence such as to allow a rational fact-finder to reasonably infer that disability was a determinative reason for the employment decision." Rayha, 940 F. Supp. at 1068.

A.    "Employer" for Purposes of the ADA

Plaintiff argues that Freescale and Manpower may be held liable as her joint or single employer. (Dkt. # 33 at 4.)   Manpower and Freescale both argue that they are not joint employers for purposes of Plaintiff's ADA claim. (See Dkt. # 30 at 4; Dkt. # 32 at 11.)   Manpower argues Freescale is Plaintiff's employer for ADA purposes, and Freescale argues Manpower is her employer for ADA purposes. Because Plaintiff's ADA claim requires an employment relationship, the first issue before the Court is whether Manpower and/or Freescale can be held liable as Plaintiff's joint employers such that they are considered her single employer.

The Fifth Circuit applies a "hybrid" economic realities/common law control test to determine whether two entities may be held liable as a joint employer. Bryant v. FMC Techs., No. H-08-3744, 2010 WL 3701576, at *4 (S.D. Tex. Sept. 16, 2010) (citing Deal v. State Farm Cnty. Mut. Ins. Co. of Tex., 5 F.3d 117, 119 (5th Cir. 1993)).   "The test analyzes four factors when considering a possible joint employer relationship: '(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or

7

financial control.'"  Id. (quoting Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir. 1983)).  Of these factors, the right to control is the most important.  Deal, 5 F.3d at 119.  The "centralized control of labor relations" factor "has been considered the most important, such that courts have focused almost exclusively on one question: which entity made the final decisions regarding employment matters relating to the person claiming discrimination?"  Skidmore v. Precision Printing and Pkg., Inc., 188 F.3d 606, 617 (5th Cir. 1999).

   Here, a genuine issue of material fact exists as to whether Manpower and Freescale are sufficiently interrelated such that a reasonable trier of fact could deem them joint employers or as a single employer for purposes of Plaintiff's ADA claim.

   The first factor, the interrelations of operations, weighs in favor of Plaintiff's argument that they may be held liable as a single employer.  Freescale admits that "[b]ecause the semiconductor industry has its ups and downs, Freescale uses temporary workers or 'temps' provided by a third-party company, Defendant Manpower, for certain assignments."  (Dkt. # 32 at 1–2.)  Freescale explains, "[w]hen business is good, Freescale has a number of temp assignments; when it declines, temps are frequently released."  (Id. at 2.)  Approximately 35% of the Operators at Freescale were placed through Manpower.  (Dkt. # 33, Ex. 1 ¶ 1.)  Further, when Manpower provides temp workers for Freescale, Manpower

provides an on-site Manpower supervisor and the Freescale supervisors provide

feedback to Manpower supervisors on the Manpower employees.  (Id.)

The evidence in this case is conflicting as to the second and third

factors—centralized control of relations and common management.  For example,

although Freescale argues that it "does not hire, fire, pay, or complete employment

evaluations on Manpower temps," (Dkt. # 32 at 2), Manpower asserts that it

advised Freescale against terminating her and it was Freescale's decision to

terminate her.[4]  (Dkt. # 30, Ex. 3 at 33:12-35.)  On the other hand, however,

Akroyd, a Freescale supervisor, testified that he participated in a conference call

with Manpower HR representative Joleen Dorsey, Freescale HR representative

Denise Chefchis, and Manpower supervisor Jerry Rivera about ending Plaintiff's

assignment with Freescale.  (Akroyd Dep. II 34:22–35:14, 132:2–7.)  When asked

about the decision to end Plaintiffs' assignment, Akroyd stated:

> A: So we had a lot of discussions, as we do with all the employees
> when it comes to this, whether it be Freescale or whether it be
> Manpower employees.  So I was part of the discussion, reviewing the
> data, looking at the trend, eventually working with Manpower through
> discussions.  And after all that was taken into consideration, then yes,
> I participated in the decision-making.
>
> Q: Who else participated in the decision to end [Plaintiff's]
> assignment at Freescale?

---

[4] At the hearing, Manpower's counsel conceded that although the ultimate decision
to terminate Plaintiff was Freescale's, Manpower participated in the decision.

> A: Manpower, the Manpower supervisor.  And again, I think it was
> Jerry Rivera . . . .

(Id. 32:2–13.)

Freescale also argues that the Manpower supervisor, pursuant to the Managed Services Agreement ("MSA") between Freescale and Manpower, is the one who has "all responsibility for relations with individuals placed with or through [Manpower], including, but not limited to . . . orientation, conflict management, performance management, discipline and discharge or other release from an assignment, and compliance with applicable Freescale policies and guidelines and all federal, state, and local government laws and regulations."  (See Dkt. # 32, Ex. A, "Addt'l Terms" ¶ (G).)  However, Plaintiff reported to both a Manpower supervisor and a Freescale supervisor  ("Akroyd Dep. II," Dkt. # 33, Ex. 1, 14:2–14:10, Nov. 18, 2013.), and  the evidence demonstrates that Manpower and Freescale worked together on performance management and disciplinary issues and that both Manpower and Freescale supervisors had input into the performance ratings of Manpower-place operators.  Alvarez, a Freescale supervisor, testified she supervised both Freescale and Manpower operators and if she identified a performance issue with a Manpower operator she would let the Manpower Supervisor know.  (Dkt. # 33, Ex. 2 at 12:22-25.)

The fourth factor, common ownership or financial control, weighs in

10

favor of Defendants.  Freescale and Manpower are separately owned, and there is no evidence that Manpower and Freescale shared in financial control.

Upon weighing all the factors, the Court concludes that an issue of fact exists as to whether Freescale and Manpower could be held as joint or single employers for purposes of Plaintiff's ADA claim.  As in <u>Trevino</u>, a determination that Manpower or Freescale are joint employers for the purposes of this action "would be premature on the basis of the record," <u>Trevino</u>, 701 F.2d at 404–05; however, the record "does not clearly indicate that [Plaintiff] cannot under any discernible circumstances prove single employer status." <u>Id.</u>  Thus, the Court denies summary judgment to either Defendant on the basis that they are not Plaintiff's employer.

B.    <u>Prima Facie Case of Disability</u>

To establish a prima facie case of disability discrimination, a plaintiff must show (1) she is disabled within the meaning of the ADA; (2) she is qualified for the job; (3) she was subject to an adverse employment action; and (4) she was replaced by or treated less favorably than non-disabled employees.  <u>St. John</u>, 537 F. Supp. 2d at 860–61 (citing <u>Gowesky</u>, 321 F.3d at 511).

Freescale argues that Plaintiff cannot establish she is a qualified individual with a disability; thus, she cannot establish a prima facie case of discrimination.  (Dkt. # 32 at 13.)  Plaintiff responds that she reported to

11

Defendants that she had an "impairment" that "affected one or more body systems;" specifically, she reported that her impairment affected her cardiovascular and endocrine systems.  (Dkt. # 33 at 10.)  Plaintiff cites 29 C.F.R. § 1630.1(c)(4) for the proposition that the Court should broadly construe the definition of "disability."  (Id. at 8.)  Section 1630.1(c)(4) states:

> Broad coverage.  The primary purpose of the ADAAA [ADA Amendments Act of 2008] is to make it easier for people with disabilities to obtain protection under the ADA.  Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA.  The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability.  The question of whether an individual meets the definition of disability under this party should not demand extensive analysis.

29 C.F.R. § 1630.1(c)(4).

To satisfy the first prong of a prima facie case of discrimination (i.e., that she is disabled within the meaning of the ADA), Plaintiff must show (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102.  In her Response to Defendants' Motions for Summary Judgment, Plaintiff concedes she does not meet the first two definitions, but argues that she was "regarded as" disabled by

Defendants.  (See Dkt. # 33 at 9 ("In this case, Ms. Burton is 'bringing a claim under the third prong of the definition' – that Freescale and Manpower discriminated against Ms. Burton by ending her assignment and refusing to offer her another – because of the impairments she disclosed in June 2011."))

In order to meet the requirement of "being regarded as having such an impairment," the individual must establish "that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A); see Gowesky, 321 F.3d at 508 ("The ADA's definition of 'disability' does, however, permit suits by plaintiffs who, though not actually disabled per § 12102(2)(A), are nonetheless 'regarded as having such an impairment.'").

The 2009 ADA amendments make it clear that under the "regarded as" prong, an employer need only perceive that the individual has a physical or mental impairment, "thus overruling court decisions requiring a plaintiff to show that the employer regarded him or her as being substantially limited in a major life activity."  See Dube v. Tex. Health and Human Servs. Com'n, No. SA–11–CV–354–XR, 2012 WL 2397566, at *3 (W.D. Tex. June 25, 2012) ("Thus, under the plain language of the statute, an employee making a 'regarded as' claim is not required to show that the disability he is perceived as suffering from is one that

13

actually limits, or is perceived to limit, a major life activity. To the contrary, cognizable ADA injury occurs when an employer takes an adverse employment action against an employee because of its perception that the employee suffers from a recognized disability …. [i]ndividuals making such a claim [of "regarding as having" a disability] are expressly relieved of having to show an actual or the perception of an actual impairment." (quoting Darcy v. City of New York, No. 06–CV–2246 (RJD), 2011 WL 841375 (E.D.N.Y. Mar. 8, 2011))). Therefore, "[u]nder the final regulations implementing the ADAAA, an individual is 'regarded as having such impairment' if the individual is subject to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." Dube, 2012 WL 2397566, at *4 (quoting 29 C.F.R. § 1630.2(*l*)).

Here, Plaintiff argues that Defendants believed that she had an impairment based upon her June 2011 disclosures. In her Response, Plaintiff correctly states that for purposes of establishing a prima facie case, she need only demonstrate that there exists an issue of fact as to each element. (Dkt. # 33 at 9.) She offers:

> Regarding the first prong – that she was "disabled or regarded as disabled," under the regulations cited above, Ms. Burton reported to the Defendants that she had an "impairment" that "affected one or

14

more body systems" – here, her cardiovascular and endocrine systems.

(Id. at 9–10.)  Plaintiff then cites to Exhibit 10 of her Response, which is a copy of the ADAAA regulations at 29 C.F.R. § 1630.2(h).  This "evidence," however, does not demonstrate anything with regard to Defendants' belief that she was "disabled" within the meaning of the ADA.  Plaintiff attached approximately 300 pages of exhibits to her Response.  She has not directed the Court to any exhibit which demonstrates a fact issue exists as to whether Defendants believed she had an actual or perceived physical or mental impairment.

Freescale presents evidence that Patricia Alvarez and Bruce Akroyd, Freescale managers in charge of Plaintiff, were unaware Burton had an alleged disability.  Specifically, Freescale cites to the following except from Alvarez's deposition:

> Q: And did she talk about any medical problems that she believed she was having because of the vapors coming from the tool set?
>
> A: Not to me, no.
>
> Q: Are you aware of any medical issues that [Plaintiff] contends she had as a result of being exposed to the vapors?
>
> A: No.

("Alvarez Dep. I," Dkt. # 32 Ex. B., 64:10–17, January 13, 2014.)  Freescale also cites to Akroyd's deposition, which states:

15

Q: Okay.  Were you aware that [Plaintiff] had claimed that the heart palpitations she had experienced were the result of her being exposed to the fumes from the 3 BSST?

A: I was made aware of that well after [she] was released.

("Akroyd Dep. I," Id., Ex. D 64:10–14.)

However, some evidence exists that Plaintiff's employers at least knew that she had some sort of impairment.  Freescale admits that Akroyd, the Freescale supervisor, generally knew that Plaintiff was claiming to have general health problems.  (Dkt. # 32 at 14 n.15.)   Further, Freescale does not dispute that Plaintiff required emergency care for chest pains and/or heart palpitations on four separate occasions between April 11 and June 11, 2011.  (Id. at 6.)  Two of those occasions occurred while Plaintiff was at work, and personnel called emergency paramedics for her.  (Id. at 7.)  The other two occasions did not occur at work, but did cause Plaintiff to miss work.  (Id.)  On July 5, 2011, Plaintiff informed Mark Rodriguez, a Freescale manager, that she was having chest pains and needed to sit down for about fifteen minutes at a time to ease the pain.  (Id.)

Based on the foregoing, the Court concludes that Defendants were at least aware that Plaintiff had some sort of physical impairment.  Because under the "regarded as" prong, an employer need only perceive that the individual has a physical or mental impairment, see Dube, 2012 WL 2397566, at *3, the Court concludes that Plaintiff has demonstrated a genuine issue of  material fact as to

16

whether she was "regarded as" disabled by Defendants.  See Mendoza v. City of Palacios, 962 F. Supp. 2d 868, 872 (S.D.Tex. 2013) (concluding a fact issue existed as to whether a plaintiff was regarded as disabled when defendant knew of plaintiff's high blood pressure after he supplied a doctor's note indicating his blood pressure was extremely elevated).

Because Defendants do not argue that she cannot demonstrate the remaining elements of a prima facie case, the Court will not address them; the Court assumes she had satisfied the remaining elements of her prima facie case for disability discrimination.

C.   Legitimate Non-Discriminatory Reason

Once a plaintiff demonstrates a prima facie showing, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  McDonnell Douglas v. Green, 411 U.S. 792, 802–04 (1973).  A defendant satisfies its burden if it produces evidence, which "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."  St. John, 537 F. Supp. 2d at 858 (quoting Price v. Federal Express Corp., 283 F.3d 715, 520 (5th Cir. 2002)).

Freescale argues that the legitimate, non-discriminatory reason for Plaintiff's termination was her poor performance and argues that Plaintiff had a

demonstrated record of performance issues.[5]  (Dkt. # 32 at 16.)

In October 2009, while Plaintiff was assigned to the CVD or Films Department, her Freescale manager at the time provided feedback to Manpower regarding Plaintiff's poor performance.  (Dkt. # 32 at 3.)  Specifically, the manager noted that Plaintiff's "attendance [was] below expectations," and that "[e]arly in the year, [Plaintiff] was counseled for her poor communication with co-workers, she was not being cooperative and was not accepting responsibility for her performance.  (Dkt. # 32, Ex. H at FSL223–26.)

In 2010 and early 2011, while Plaintiff was assigned to the Etch department, the Freescale manager of that department, Sharon Honerlah, also provided feedback to Manpower regarding Plaintiff's continued performance deficiencies.  (Id. at 181–84.)  Specifically, Honerlah provided written feedback stating that Plaintiff "[had] snapped at her trainer on one occasion," "tend[ed] to wander" out of the work area, and "based on 4 weeks performance, [the manager] would rate [Plaintiff] on the border between Meeting and Below Expectations."

_____

[5] Manpower argues that it did not make the ultimate decision to terminate Plaintiff's assignment, but there is a legitimate non-discriminatory reason for its compliance with Freescale—the MSA between Freescale and Manpower giving Freescale the unilateral authority to end an individual's assignment, thus requiring Manpower to comply.  (Dkt. # 30 at 6.)  However, at the hearing, Manpower's counsel stated that Manpower did not disagree with Freescale's reasons for terminating her assignment, but just that it advised Freescale against it.

(Id. at 184.)

On May 22, 2011, Honerlah sent an email to Patricia Alvarez regarding Plaintiff's performance stating:

> I inherited [Plaintiff] without my input.  If I had been asked, I would
> not have accepted her.  Michelle thought she would be a great asset
> because she had Etch experience.  What I had witnessed for months
> (in Films) was an operator with an attitude that no one had dealt with.
> She can be a hard worker, if she wants to be.  She still tends to wander
> away.  She still, even after I've given her feedback on it, likes to
> stand in front of the computer by E01BFSI, rather than see what she
> can do to help Maria in the bay.  I would rate her very middle ground.

(Dkt. # 32, Ex. I at 7.)

Also, in January 2011, Plaintiff broke a "wafer" while at work and Honerlah informed a Manpower supervisor, Rivera, of the incident.  (Id. at 9.) According to Defendants, wafers are the platforms which house the microchips, and breaking a wafer means that those microchips can no longer be sold.  (Dkt. # 32 at 4.)  Plaintiff does not dispute she broke the wafer and that this was a performance deficiency.  (Dkt. # 32 at 4 (citing "Plaintiff's Depo.," Dkt. # 32, Ex. J, 245:22–246:9, July 18, 2013).)  Further, it is not disputed that Manpower supervisor Rivera met with Plaintiff and provided her a formal write-up concerning the incident.  (Dkt. # 32 at 4; id., Ex. I at 10–11.)

In April 2011, Alvarez became the Freescale Etch Department Manager.  (Dkt. # 32 at 4.)  From April to June 2011, Alvarez saw Plaintiff

19

leaning on workstations.  (Id., Ex. G. at 18.)  She also counseled Plaintiff for

failing to keep her nose covered as was required in the work area.  Alvarez stated,

"[i]n our clean room environment, it's important to keep your nose covered.

Particles go throughout the area and can contaminate wafers.  It causes us to lose

yield."  (Id., Alvarez dep. I, 22:24–23:23.)  Alvarez also noticed that Plaintiff did

not "escalate issues in her bay," noting that

> [t]here was a couple of hundred wafers that could have run on her tool
> but it was contrained [sic].  She moved all the work to bay A to a tool
> that could also run those lots, however there was other work that
> needed to run on that toolset.  I asked her why she did not escalate to
> me or sustaining that her tool was constrained and she just said she
> moved them over to Bay A because they can run there too and that she
> could not track in lots.  I told her that in the future she needs to ask
> sustaining for help and if they are unable to help she needs to let me
> know.

(Id., Ex. G at 18.)  On June 28, 2011, Alvarez found Plaintiff on the internet in her

workspace during work hours.  (Dkt. # 32 at 5; id., Alvarez Dep. I 24:11–13.)

Alvarez stated, "I had received feedback from multiple people that she would visit

the Internet.  And I needed to observe it for myself.  So when I approached her

with that, I just – that's when I dialogued with her."  (Id. 25:25–26:3.)  As to

Plaintiff's performance issues in general, Alvarez stated:

> In addition to what I've given you, she would also leave the area
> multiple times, where we didn't know where she was at.  We couldn't
> – we couldn't locate her.  We'd have to send somebody looking for
> her.  And then there was the Internet usage, I think was the final straw
> collectively, with all the other issues that we were having.

20

(Id. 39:9–15.)

Based on the foregoing, the Court concludes Freescale has met its burden of producing a legitimate, non-discriminatory reason for the adverse employment action—Plaintiff's poor performance.

D.    Pretext

Once a defendant meets its burden of producing a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to plaintiff to demonstrate a genuine issue of material fact as to whether defendants were motivated by discriminatory animus.  St. John, 537 F. Supp. 2d at 858.  A plaintiff may meet this burden by showing either (1) that a defendant's articulated reason was pretexual, or (2) that plaintiff's protected characteristic was a motivating factor in the decision.  Id.

Here, Plaintiff argues that Defendants' proffered reasons are pretextual (see Dkt. # 33 at 15); thus, Plaintiff must demonstrate that a genuine issue of material fact exists that the articulated reason for the adverse employment action was mere pretext for unlawful discrimination.  McDonnell, 411 U.S. at 280. To carry this burden, however, Plaintiff "must produce substantial evidence of pretext."  Auguster v. Vermillion Parish Sch. Bd., 249 F.3d 400, 402–03 (5th Cir. 2001).  "The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

Plaintiff argues that the evidence shows Defendants' proffered reason is false or unworthy of credence.  (Dkt. # 33 at 15.)  "Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." E.E.O.C. v. La. Office of Comm. Servs., 47 F.3d 1438, 1443–44 (5th Cir. 1995). The Court will address each of her pretext arguments in turn.

a.      Alleged Inconsistencies in Evidence

Plaintiff asserts that various "inconsistencies" in the evidence demonstrate that Defendants' proffered reasons for termination is false or unworthy of credence.

i.      E.E.O.C. Representations

First, Plaintiff argues that alleged misrepresentations made to the E.E.O.C. demonstrate the falsity of Defendants' pretexual reasons.  (Dkt. # 33 at 16.)  Plaintiff cites to a letter from Manpower to the E.E.O.C., which states the following regarding the reasons for her termination:

> In July 2011, Manpower was informed by its customer, Freescale, that it wanted to end Ms. Burton's assignment due to performance issues. The reasons for the termination of the assignment included the following:
> - January 2011 – broken wafer

22

- June 28, 2011 – unauthorized use of internet
- July 19, 2011 – qualification of tools were not being performed
- July 25, 2011 – wafer boats were not balanced

(Id., Ex. 11).  However, Plaintiff argues that the decision to terminate her assignment was made prior to at least two of these instances.  (Id. at 16.)  In support, Plaintiff cites to email correspondence produced by Defendant regarding her termination.  The email correspondence starts on July 19, 2011, and is between Bruce Akroyd and Jerry Rivera (id., Ex. 9 at 5); thus, it was indeed sent before the July 25 wafer boat incident.  However, also in the email chain is a July 25 email from Rivera to another Manpower employee regarding Plaintiff's termination.  Rivera explains the background on Plaintiff's performance issues:

> [Akroyd] states that she has had 1 write up in the past for a protocol violation which we did execute.  He cites 2 more protocol violations in this email which are (1.) leaning on the robotic tools and (2.) not having her nose covered up by her clean room suit hood.  We have not documented her for either of these instances or warned her.  He also cites 2 times that she had been caught on the internet while in the work area which is a work place violation also.  We have not documented her for either of these instances or warned her.

(Dkt. # 33, Ex. 9 at 1.)  This demonstrates that there were in fact additional reasons for Plaintiffs' termination, which is reflected in the letter to the E.E.O.C. stating that "the reasons for the termination of the assignment included the following."

(Id., Ex. 11 (emphasis added).)  The list was not an exhaustive list of the reasons Plaintiff was terminated.  Thus, the E.E.O.C. letter did not include any

23

"misrepresentations" and is not evidence of pretext.

    ii.  <u>Inconsistencies in testimony</u>

    Next, Plaintiff points to alleged inconsistencies in the testimonies of Akroyd and Alvarez as evidence of pretext.  Plaintiff states that Akroyd testified that the July 25, 2011 incident with the wafer boats was one of the reasons he made the decision to terminate Plaintiff, then later testified that Plaintiff's alleged unauthorized use of the Internet on June 28, 2011 was the reason he decided to terminate her.   (Dkt. # 33 at 17.)  However, Plaintiff mischaracterizes Akroyd's testimony.  The relevant testimony is as follows:

> Q: . . . Was the bullet point – was the last bullet point, July 25, 2011, wafer boats were not balanced – was that one of the reasons that Freescale wanted to end [Plaintiff's] assignment?
>
> A: It was an example of one of the items.
>
> Q: I'm not asking whether it was an example.  I'm asking whether that particular bullet point was one of the reasons Freescale wanted to terminate [Plaintiff's] assignment.
>
> A: I can only answer that by saying that there were many factors that decided that.  I can't say that that one bullet is the reason, no.  I cannot say that.

(Akroyd Dep. II 42:5–16.)  Later, Akroyd states:

> Q: So what did she do in between making the report about the 3 BSST and you deciding to terminate her that caused you to decide to terminate her?
>
> A: So the final event I think that I mentioned earlier was on 6/28, if

that's the right date – is, sorry.  Let me go through this real quick.
The Internet.  So the Internet was kind of the final one that said, with
all this pooled together collectively, this is just one more after giving
continuous feedback on things that need to be done that we said, okay,
that's enough.

(Id. 74:24–75:8.)  There is nothing inconsistent here.  When asked by Plaintiff's

counsel whether the July 25, 2011 wafer boat incident was one of the reasons for

Plaintiff's termination, Akroyd responded that he cannot say that the wafer boat

incident, in itself, was the reason.  Later, he testified that the he believed the June

28, 2011 Internet incident was the "final one" that started the process of her

termination.  There is nothing inconsistent here and therefore there is no evidence

of pretext.

Next, Plaintiff argues that other various inconsistencies evidence

pretext.  Specifically, she argues that Akroyd could not remember at what point he

learned that Plaintiff had used the Internet and he did not know who had spoken

with her about the unauthorized use.  (Dkt. # 33 at 18.)  However, Plaintiff does

not explain, and the Court fails to see, how this creates a genuine issue of material

fact as to pretext—Akroyd's failure to recall the specific date he learned about the

Internet and who actually spoke with Plaintiff regarding her Internet usage, alone,

is not evidence of pretext.

Plaintiff also points to alleged inconsistencies in testimony regarding

who participated in the decision to terminate Plaintiff.  (Dkt. # 33 at 18.)

25

Specifically, Plaintiff argues that when Alvarez was asked whether she talked to Akroyd about any performance issues she had with Plaintiff, Alvarez said "no."[6] Also, when asked whether he remembered speaking with Akroyd about releasing Plaintiff before the July 19 email, Rivera said he could not.   But, when Akroyd was asked who participated in the initial round of discussion about Plaintiff's termination, Akroyd said he had participated with Alvarez and Rivera.  Again, Plaintiff fails to articulate how exactly this evidences pretext, other than these alleged "inconsistencies" in testimony, in and of themselves, must be proof that Plaintiff's poor performance was a false reason for her termination.

Akroyd's depositions were taken on November 18, 2013, and January 13, 2014, well over two years after the instances that he was questioned about occurred.  Likewise, Alvarez's deposition was taken January 18, 2014, and Rivera's was taken November 21, 2013.  A person cannot be expected to be able to recall every single detail from two-and-one-half years prior.  Plaintiff attempts to pick apart each person's deposition testimony line by line; however, Plaintiff

---

[6] Also in Alvarez's testimony, Alvarez states that she discussed the June 28 Internet incident with Shawn Stroud.  (Alvarez Dep. I 30:23–31:5.)  The email correspondence attached by Plaintiff shows that an email was sent to Rivera from Akroyd, "CC'ing" Stroud and Alvarez and directly asking Stroud whether he had obtained documentation regarding Plaintiff's performance issues from Alvarez. (See Dkt. # 33, Ex. 9 at 4.)  Therefore, it appears that Stroud obtained the documentation from Alvarez on behalf of Akroyd.  There is nothing "inconsistent" about Alvarez's testimony.

"must produce substantial evidence of pretext" in order to survive summary

judgment.  See Auguster, 249 F.3d at 402–03.  These small inconsistencies do not

rise to that level.

Next, Plaintiff argues that pretext may be found "in the evidence that

Freescale failed to notify Manpower of any issues with [Plaintiff's] performance

before it asked her to be removed from her assignment."  (Dkt. # 33 at 19.)

Plaintiff asserts that this "failure was a violation of the procedures the two

companies had developed for managing the performance of Manpower-placed

Operators at Freescale."  (Id.)  Again, the Court is perplexed as to how this alleged

"violation of procedures" demonstrates that Defendants' reason for Plaintiff's

termination—poor performance—is merely pretext for discrimination.  In any

event, Plaintiff's allegation of the failure of Freescale to follow procedure and

notify Manpower of any of Plaintiff's performance issues is wholly rebutted by the

evidence presented in this matter.  In fact, Plaintiff, in another section of her

Response, argues that Manpower and Freescale can be considered joint employers

because "the process of deciding to terminate [Plaintiff] occurred in at least two

steps, with the initial step being discussions with [Plaintiff's] Freescale and

Manpower supervisors, and the final step being a conference call that was attended

by HR and management from both companies."  (Id. at 4–5.)  This argument

completely contradicts Plaintiff's argument made here regarding pretext.  The

27

evidence does not demonstrate that Freescale failed to notify Manpower of any issues with Plaintiff's performance before it asked her to be removed from her assignment; in fact, it demonstrates that Alvarez (Freescale) informed Plaintiff's Manpower supervisors of Plaintiff's performance issues on multiple occasions.

As discussed above, in October 2009, Plaintiff's Freescale manager at the time provided feedback to Manpower regarding Plaintiff's poor performance. (Dkt. # 32 at 3; id., Ex. H FSL223–26.)  Specifically, the manager noted that Plaintiff's "attendance [was] below expectations," and that "[e]arly in the year, [Plaintiff] was counseled for her poor communication with co-workers, she was not being cooperative and was not accepting responsibility for her performance."[7] (Id., Ex. H at 223–26.)

Additionally, as discussed above, in 2010 and early 2011, while Plaintiff was assigned to the Etch department, the Freescale manager of that department, Honerlah, also provided feedback to Manpower regarding Plaintiff's continued performance deficiencies.  (Id. at 181–84.)  Specifically, Honerlah provided written feedback stating that Plaintiff "[had] snapped at her trainer on one occasion," "tend[ed] to wander" out of the work area, and "based on 4 weeks performance, [the manager] would rate [Plaintiff] on the border between Meeting

---

[7] This performance evaluation did, however, note improvement in Plaintiff's "customer focus and communication with her co-workers."  (Id.)

28

and Below Expectations."  (Id. at 184.)

Plaintiff also argues that pretext is demonstrated by Alvarez "changing her story mid-deposition" about whether she recommended Plaintiff's termination.  (Dkt. # 33 at 21.)  Specifically, Plaintiff argues that Alvarez initially testified that she did not know who made the initial recommendation for Plaintiff's termination; however, Alvarez later changed her story, stating that she was in fact the person who recommended Plaintiff's termination.  (Id.)  The portions of Alvarez's deposition that are cited in support of this argument are as follows:

> Q: Do you know who made the initial recommendation that [Plaintiff's] employment – or that [Plaintiff's] assignment at Freescale be ended?
>
> A: Can you say that again?
>
> Q: Yeah.  Do you know who made the initial recommendation that [Plaintiff's] assignment at Freescale be ended?
>
> [Defendant's counsel]: Objection, vague and confusing.
>
> A: No, I don't know who made the initial recommendation for termination.
>
> Q: And did you participate in any conversations about the possibility of ending [Plaintiff's] assignment at Freescale before her assignment was ended?
>
> A: No.
>
> Q: Do you know what the final incident was that caused Freescale to want to release [Plaintiff] from her employment there?

[Defendant's counsel]: Objection, assumes facts not in evidence.

A: No, I do not know.

("Alvarez dep. II", Dkt. # 33, 17:21–18:17, January 13, 2014.)

Q: Okay.  Back on the record after a short break.  Ms. Alvarez, did you have anything that you wanted to change or add about your testimony before I ask you more questions?

A: Yes, I did.  After thinking about one of the questions – and maybe I misunderstood it, was who made the recommendation for [Plaintiff's] termination.  I believe there was a slight pause.  I actually made the recommendation.

Q: Oh.  What caused you to remember that?

A: Just because when you asked me, there was a slight pause at the end, and I kind of – because I was thinking about the question, didn't really understand it.  And as I thought about it, I made the recommendation.

(Id. 37:3–17.)

While indeed Alvarez corrected her testimony, she did so in response to Plaintiff's counsel's question about whether she wanted to add anything or change anything about her testimony.  Alvarez replied, stating that she misunderstood his previous questions, and, after thinking about one it, she wanted her testimony to reflect the correct answer.  Nothing here demonstrates pretext.

Accordingly, none of these alleged "inconsistencies" in evidence demonstrate that Defendants' reason of poor performance is merely pretext for Plaintiff's termination.

b.    Temporal proximity

Next, Plaintiff argues that the timing of her disclosure of her impairments and her termination are evidence of pretext.  (Dkt. # 33 at 22.) Plaintiff argues that her impairments were disclosed on June 12, 2011, and she was selected for termination in late June.  (Id.)

However, "temporal proximity standing alone is insufficient to establish an issue of fact as to pretext after an employer has provided a non-retaliatory reason."  Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 487 (5th Cir. 2008).  The case cited by Plaintiff, Baumeister v. AIG Global Inv. Corp, 420 F. App'x 351, 356 (5th Cir. 2011), indeed holds that temporal proximity may be sufficient evidence of pretext when considered in conjunction with other pretext evidence.  However, in Baumeister the Court ultimately concluded that even if the district court had considered her temporal-proximity evidence in conjunction with other evidence, it was insufficient for a reasonable jury to conclude that defendant's legitimate reason for laying her off is unworthy of credence.  Id.

Here, as discussed above, Plaintiff has not provided any evidence of pretext.  Moreover, even assuming that she disclosed her impairments on June 12, 2011, and was selected for termination in "late" June, the evidence demonstrates that Plaintiff's performance record was not satisfactory prior to her disclosure of her impairment.  In Shirley v. Chrysler First, Inc., 970 F.2d 39, 43–44 (5th Cir.

1992), the plaintiff demonstrated the causation element of her prima facie case of retaliation not by solely relying upon temporal proximity, but also by showing that she had no disciplinary history during her nine years of employment and was quickly fired for incident for which no evidence existed after she filed a complaint with the EEOC.   Thus, the plaintiff in Shirley provided other evidence to be considered in conjunction with temporal proximity.  Here, Plaintiff has not done so.  Therefore, her evidence of temporal proximity, alone, is insufficient to raise a genuine issue of material fact as to pretext.

In sum, Plaintiff has not raised a genuine issue of material fact as to whether Defendants' proffered legitimate non-discriminatory reasons for her termination are merely pretext for discrimination.   Therefore, the Court grants Defendants' Motions for Summary Judgment on Plaintiff's discrimination claim.

II.    Retaliation Claim

Plaintiff also alleges she was retaliated against by being discharged after she filed a good faith workers' compensation claim in violation of § 451.001 of the Texas Labor Code.  (Dkt. # 33 at 24.)

Defendants argue that summary judgment is proper because Plaintiff fails to establish a causal connection between her workers' compensation claim

and her termination.[8]  (Dkt. # 32 at 19.)  However, even if Plaintiff demonstrates a

prima facie case, Defendants argue that she cannot demonstrate "but for"

causation. (Id.)

Plaintiff argues that establishing temporal proximity between a

plaintiff's protected conduct and the adverse employment action will establish a

prima facie case of retaliation.  (Dkt. # 33 at 25.)  Here, Plaintiff alleges that

because she filed a worker's compensation claim approximately two weeks before

Defendants decided to replace her, this evidence alone establishes a prima facie

case.

Section 451.001 provides that a person may not discharge or in any

other manner discriminate against an employee because the employee has filed a

workers' compensation claim in good faith.  Tex. Lab. Code § 451.001.  "In

pursuing a claim under § 451.001, the plaintiff has the burden of establishing a

causal nexus between the filing of a worker's compensation claim and his

discharge or other adverse action taken by his employer."  Munoz v. H&M

Wholesale, Inc., 926 F. Supp. 596, 609 (S.D. Tex. 1996).  The Supreme Court of

---

[8] Freescale first argues that it cannot be held liable because it did not have any
interest in Plaintiff's workers' compensation claims.  It asserts that pursuant to the
MSA, Manpower handled workers' compensation claims for its placed employees.
However, because as discussed earlier, the Court concludes a fact issue exists as to
whether Freescale and Manpower may be held as Plaintiff's joint employers, we
will assume they are and analyze Plaintiff's retaliation claim as such.

Texas has held that the standard of causation in cases under § 451.001 "'should be

the employee's protected conduct must be such that, without it, the employer's

prohibited conduct would not have occurred when it did;' however, the employee

need not provide that it was the sole reason for the employer's adverse action." Id.

(citing Tex. Dept. of Human Servs. v. Hinds, 904 S.W.2d 629, 634, 636 (Tex.

1995)); see Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.

1996) (holding that the standard of causation in § 451.001 claims must be such

that, without the employee's protected conduct, the employer's prohibited conduct

would not have occurred when it did).  Thus, a plaintiff "must show that but for the

filing of his workers' compensation claim, his termination would not have

occurred when it did." Echostar Satellite L.L.C. v. Aguilar, 394 S.W.3d 276, 288

(Tex. App.  2010).

        In Strong v. Univ. Healthcare  Sys., L.L.C., 482 F.3d 802 (5th Cir.

2007), the Fifth Circuit clarified the role temporal proximity plays in retaliation

cases:

>  To prevent future litigants from relying on temporal proximity alone
> to establish but for causation, we once again attempt to clarify the
> issue.  In Clark County School District v. Breeden, the Supreme Court
> noted that "cases that accept mere temporal proximity . . . as sufficient
> evidence of causality to establish a prima facie case uniformly hold
> that the temporal proximity must be 'very close.'"  Breeden makes
> clear that (1) to be persuasive evidence, temporal proximity must be
> very close, and importantly (2) temporal proximity alone, when very
> close, can in some instances establish a prima facie case of retaliation.

34

But we affirmatively reject the notion that temporal proximity
standing alone can be sufficient proof of but for causation.  Such a
rule would unnecessarily tie the hands of employers.

Id. at 808 (internal citations omitted).  Thus, while temporal proximity may be

sufficient to establish the "causal link" element of a prima facie case of retaliation,

it is not sufficient to establish "but for" causation, which is the plaintiffs' ultimate

burden.  See Echostar, 394 S.W.3d at 288.

Even assuming Plaintiff has demonstrated a prima facie case of

retaliation, she cannot show that but for her workers' compensation claim she

would not have been terminated.  In her Response, Plaintiff states that the pretext

analysis for her § 451.001 claim is the same as that for her ADA and TCHRA

claims.  As discussed above, however, Plaintiff has not demonstrated any evidence

of pretext on her ADA claims save for her evidence of temporal proximity;

however, temporal proximity, alone, is insufficient to demonstrate pretext.  As it

pertains to her § 451.001, temporal proximity, alone, is likewise insufficient to

demonstrate but for causation.  Accordingly, Plaintiff's § 451.001 retaliation claim

fails as a matter of law.

<u>CONCLUSION</u>

For the reasons given, the Court hereby **GRANTS** Defendants'

Motions for Summary Judgment (Dkt. ## 30, 32).

IT IS SO ORDERED.

DATED:  Austin, Texas, August 7, 2014.

_____
David Alan Ezra
Senior United States Distict Judge

36